IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **JIMMY MCINTOSH**, <br>      Plaintiff <br> <br> vs. <br> <br> **UNITED STATES OF AMERICA**, <br>      Defendant | NO. 3:20-CV-3319 |

# ORIGINAL COMPLAINT

Plaintiff JIMMY MCINTOSH brings this complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiff would show the following:

# PARTIES

1.1. This case arises out of bodily injuries caused by agents and employees of the United States at the Dallas VA Medical Center in Dallas, Texas.

1.2. Plaintiff is Jimmy Dale McIntosh. Mr. McIntosh resides in Caddo Mills, Texas.

1.3. Defendant is the United States of America.

## JURISDICTION, SERVICE & VENUE

2.1.    This Federal District Court has jurisdiction because this action is brought under 28 U.S.C. § 2671–80, commonly known as the Federal Tort Claims Act.

2.2.    The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on the United States Attorney Erin Nealy Cox, United States Attorney for the Northern District of Texas, by certified mail, return receipt requested at her office:

>   United States Attorney Erin Nealy Cox
>   ATTN: Civil Process Clerk
>   United States Attorney's Office, Northern District of Texas
>   1100 Commerce Street, Third Floor
>   Dallas, Texas 75242-1699

2.3.    Service is also affected by serving a copy of the Summons and Complaint on William Barr, Attorney General of the United States, by certified mail, return receipt requested at:

>   The Attorney General's Office
>   ATTN: Civil Process Clerk
>   950 Pennsylvania Avenue, NW
>   Washington, DC 20530-0001

2.4.    Venue is proper in this judicial district under 28 U.S.C. § 1402(b) because the United States of America is a defendant and the acts and omissions complained of in this lawsuit occurred in this judicial district. Venue is further appropriate in this district because the Plaintiff resides within this judicial district.

## LIABILITY OF THE UNITED STATES OF AMERICA

3.1.    This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the complaint is made were proximately caused by the negligence, wrongful acts and/or omissions of employees and/or agents of the United States of America working for the Dallas VA Medical Center, while acting within the scope of their office, employment, and/or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiff in the same manner and to the same extent as a private individual under the laws of the State of Texas.

3.2.    The United States Department of Veterans Affairs (VA) is an agency of the United States of America.

3.3.    The Defendant United States of America, through its agency, at all times material to this lawsuit owned, operated, and controlled the Dallas VA Medical Center in Dallas, Texas and staffed its facilities with its agents, servants, and employees.

3.4.    At all times material to this lawsuit, all persons involved in the medical and health care services provided to Plaintiff Jimmy Dale McIntosh at the Dallas VA Medical Center were agents, servants, and/or employees of the United States of America, or some agency thereof, and were at all material times acting within the course and scope of such employment.

3.5.    In March of 2015, Drs. Michael G. Browne and Gregory L. Naugher were employees, agents, or servants of the United States of America, or some

agency thereof, and were at all material times acting within the course and scope of such employment in their care and treatment of Mr. McIntosh.

3.6. In 2015, Jimmy McIntosh was a patient of the Dallas VA Medical Center in Dallas, Texas and its providers had a doctor-patient relationship with Mr. McIntosh.

## JURISDICTIONAL PREREQUISITES

4.1. Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the claims set forth in this Complaint here were filed with and presented administratively to the Department of the VA on September 2, 2016. Receipt of the claims was acknowledged by the Department of the VA on September 8, 2016. Plaintiff amended his claim and presented the same to the Department of the VA. The VA acknowledged receipt on February 24, 2017. On May 21, 2020, the VA sent, by certified mail, a final denial of Mr. McIntosh's claims.

4.2. Mr. McIntosh set forth a "sum certain" in his administrative claims of $1,000,000.

4.3. Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this suit.

## FACTS

5.1. This is a Federal Tort Claim Action for monetary damages sustained by Plaintiff arising out of the personal injuries to Jimmy McIntosh, as a result of

substandard—and therefore negligent—medical and hospital care at the Dallas VA Medical Center on or around March 16, 2015. In March 2015, Mr. McIntosh was 58 years old.

5.2.  In August 2014, Mr. McIntosh underwent an MRI on his right shoulder joint to explore his recurrent anterior instability. Compared to previous films, the imaging showed worsening glenoid surface irregularity with increased cysts, erosions, cartilage loss, and increased metallic artifact throughout the glenohumeral joint. His radiology reports noted that his condition was likely due to metal debris, tendinosis, and partial tearing of the supraspinatus, infraspinatus and subscapularis tendons. Based on these problems, his providers recommended surgical repair based on the expectation that surgical repair would provide stability and return to Mr. McIntosh's activities of daily living.

5.3.  Before his surgery, his right shoulder and arm were still functional. Such functionality was especially essential to Mr. McIntosh because he has a left leg below-the-knee amputation. Being able to use his right arm was key to navigating daily life—from getting out of bed and putting on his prosthesis to maintaining his balance while walking. Given the advice and recommendation of the VA, he elected to undergo a right total shoulder arthroplasty.

### *The Right Shoulder Arthroplasty*

5.4.  On March 16, 2015, Dr. Gregory L. Naugher performed a right total shoulder arthroplasty on Mr. McIntosh. Dr. Michael G. Browne was reportedly present and scrubbed for the entire procedure. Instead of using a polyethylene component, Dr. Naugher installed a metal-backed glenoid. Operative notes included the following:

- an intact rotator cuff;
- end-stage arthritis of mainly the humeral head cartilage;
- moderate to severe arthritis of the glenohumeral joint; and,
- scarring and suture along the inferior aspect of the glenoid.

5.5. Post-operatively, Mr. McIntosh participated in physical therapy three times per week for three months until he began experiencing sharp, burning, constant pain in his right shoulder. It felt like it had come out of socket. His right arm function deteriorated until its use was almost completely impaired. This impairment limited the arm's range of motion and ability to lift objects, interfering with Mr. McIntosh's work as a plumber, and caused difficulties managing his below-the-knee amputation and prosthesis. The pain increased to the point that Mr. McIntosh could not sleep soundly and would wake often from nighttime pain.

5.6. He then went to Dallas Limb Restoration for another opinion. There, Mr. McIntosh presented the severe deficits in his right shoulder and right arm range of motion. An x-ray of the right shoulder revealed loosening of the glenoid with slight migration proximally, which was not caused by rotator cuff problems. Instead, the loosened glenoid was causing the problem, caused pain even on rotation, and looked to be a metal-backed glenoid which providers rarely use anymore. Mr. McIntosh learned that he needed to have another revision surgery using a simple polyethylene glenoid to correct the mistakes performed by the VA in March 2015.

### *The First Revision Surgery*

5.7. So, on May 23, 2016, Mr. McIntosh underwent revision surgery. His surgeon noted that the revision surgery was extremely difficult. Operative reports revealed additional problems like minor numbness and tingling in Mr. McIntosh's hands, weakened grip in his right hand, and significant arthrofibrosis of the right

shoulder. An x-ray showed a completely loose glenoid and migration of the humerus and humeral head indicative of rotator cuff incompetency. The operative report also revealed just how poorly the VA doctors Naughter and Browne performed the March 2015 surgery. The trabecular metal shoulder prosthesis installed previously by VA doctors was so ingrown that the revision surgeon predicted he'd have to take the bone off to remove it.

5.8. As the revision surgeon expected, there was a completely oversized humeral head in Mr. McIntosh's shoulder. The prosthesis was significantly ingrown, so much so that it could not be knocked loose but was removed only with multiple attempts to cut away the surrounding bone. The revision procedure involved bone grafting of the large cavitary defect, scapula, and glenoid. Ultimately, the revision surgeon had to abandon some aspects of the reconstruction, concluding that there was bone posteriorly that was defective and so ingrown into the prosthesis that he could not do anything. Faced with such obstacles, the revision surgeon did his best to correct the VA doctors' errors by building on to the lateral and medial part of the prosthesis.

5.9. The May 23, 2016, revision procedure revealed the negligence of the VA medical providers involved in Mr. McIntosh's right total shoulder arthroplasty. Dr. Naugher was negligent in using the Zimmer apparatus, a metal-backed glenoid known to foment bone ingrowth. With polyethylene components widely available, there was no need to use a metal-backed glenoid known to have ingrowth issues. Unfortunately, this glenoid did in fact cause Mr. McIntosh significant bone ingrowth, resulting in pain, damaging inflammation, and complicating Dr. Buch's revision surgery by necessitating significant bone removal and impeding certain

techniques—complications that would have been avoided had a polyethylene glenoid been utilized. Using a grossly oversized humeral head only compounded the VA's negligence. Simply put, these complications almost guaranteed a substandard outcome. The prior negligence of VA medical providers compromised the efficacy of the May 23, 2016 surgery.

### *The Second Revision Surgery*

5.10.    In June 2016, Mr. McIntosh learned that another surgery might be necessary. His revision surgeon flatly stated that the problem was using a metal shoulder. His bone was so involved that Mr. McIntosh learned he might lose it altogether. One month later, imaging confirmed that his shoulder would not heal. Mr. McIntosh reported the same level of pain, but with too much clicking and popping and still no improvement in function. He was advised that another surgery would be required to stabilize the proximal area, either by using reconstruction plates or removing it entirely.

5.11.    On August 1, 2016, Mr. McIntosh underwent yet another right shoulder surgery to repair the fracture and nonunion of the proximal humerus and tubercle. Once the second revision surgery began, providers noted wear and metal tear around the prosthesis where the fixation loosened. Because the bone was so weak and osteoporotic, providers had to remove rather than repair the bone. Mr. McIntosh's risk of shoulder dislocation would now be higher. Imbrication and capsulorrhaphy of the right proximal shoulder along with synovectomy of the shoulder were then performed. Now, all that's left holding Mr. McIntosh's shoulder in place is scar and the soft tissue. And if this approach does not work, Mr. McIntosh will require a capsule in the future.

## CAUSE OF ACTION

6.1.     U.S. Government health care providers were negligent by failing to utilize the appropriate prosthetic device during Mr. McIntosh's right shoulder arthroplasty on March 15, 2016. They were also negligent by failing to use an appropriately sized humeral head during that same surgery. Metal-backed glenoids are seldom used specifically because of their capacity for bone ingrowth. In fact, multiple studies have shown that metal-backed glenoids have a higher failure rate than all polyethylene components and are not a viable long-term therapeutic option.

6.2.     There was no reason for Mr. McIntosh's surgeons to use a metal-backed glenoid instead of a polyethylene prosthetic. Failing to do so, and failing to use an appropriately sized humeral head, led to devastating consequences for Mr. McIntosh. The metal-backed glenoid caused severe bone ingrowth and corresponding bone weakness. This weakness destabilized bones critically needed for union, causing right periprosthetic fracture, nonunion, intense pain, and severe impairment. The ingrowth also necessitated significant bone removal to detach the prosthesis during the first revision surgery, limited aspects of anterior reconstruction, prevented proper tightening of the glenoid, and limited options for screw holes—all of which exacerbated the bone union problems. Prudent health care providers would have used the appropriate (not metal) backing for the glenoid and would have used the correct size of humeral head.

6.3.     In sum, U.S. Government providers were negligent in one or more of the following ways:

> (a) failing to utilize the appropriate prosthetic device during Mr. McIntosh's right shoulder arthroplasty on March 15, 2016;

(b) failing to use an appropriately sized humeral head during that same surgery;

(c) failing to train and supervise staff and residents in the surgical care of Mr. McIntosh;

(d) failing to timely and properly care for Mr. McIntosh;

(e) failing to timely and properly evaluate Mr. McIntosh's shoulder needs;

(f) failing to timely and properly maintain continuity of care and prevent communications breakdowns between its employees concerning Mr. McIntosh's care.

6.4. If U.S. Government health care providers had performed as reasonably prudent surgeons, as stated above, it is more likely than not that Mr. McIntosh would not have suffered such severe complications, pain, and impairment, nor required additional surgeries, and would not have been impaired such that he was unable to work. Not being able to use his right arm also dramatically complicates navigating his left-leg prosthesis. He cannot put on a belt without assistance, much less maintain the small horse ranch he and his wife live on. The tasks he can no longer perform—like unloading hay or digging postholes—have fallen to his wife to try to manage. Finally, Mr. McIntosh still may need yet another right shoulder surgery if the prosthetic capsule does not hold firm or "scar down" over the deltoid.

## DAMAGES

7.1.    At all times relevant to this lawsuit, the officers, employees, agents, or representatives of the United States were negligent and caused the injuries and damages sustained by Plaintiff. Because of the negligence of the United States employee healthcare providers, Mr. McIntosh sustained damages and injuries including:

> (a) Reasonable and necessary past and future medical expenses;
>
> (b) Reasonable and necessary attendant, home health, and nursing care expenses;
>
> (c) Past loss of earnings;
>
> (d) Future loss of earning capacity;
>
> (e) Past and Future physical impairment;
>
> (f) Past and Future physical disfigurement;
>
> (g) Past and future pain and suffering;
>
> (h) Past and future mental suffering;
>
> (i) Past and future injury to Mr. McIntosh's peace and happiness; and
>
> (j) All other damages to which he is entitled to under the applicable federal and state laws.

## RELIEF REQUESTED

Plaintiff requests that the United States be cited in terms of law to appear and answer this lawsuit. Upon final trial, Plaintiffs seek judgment against the United States for the amount of actual damages and for such other and different amounts that they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in the prosecution of this lawsuit; and for such other relief, in law or equity, both general and special, to which the Plaintiff may show themselves entitled to and to which the Court believes him deserving.

Respectfully Submitted,

/s/ Tom Jacob
**TOM JACOB**,
  tjacob@nationaltriallaw.com
  Texas State Bar #24069981
**STEVEN HASPEL**, *membership application forthcoming*
  shaspel@nationaltriallaw.com
  Texas State Bar #24109981
**WHITEHURST, HARKNESS, BREES, CHENG, ALSAFFAR, HIGGINBOTHAM, & JACOB P.L.L.C.**
7500 Rialto Blvd, Bldg. Two, Ste 250
Austin, TX 78735
(512) 476-4346 (o)
(512) 467-4400 (f)

Attorneys for Plaintiff